UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LUTGARDO SILVA                              CIVIL ACTION

VERSUS                                      NUMBER: 06-0199

BURL CAIN                                   SECTION: "K"(5)


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, Lutgardo Silva, and the State's response thereto. (Rec. docs. 1, 5). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that Silva's petition be dismissed with prejudice.

Petitioner Silva is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On January 18, 1996, Silva was found guilty of second degree murder after trial, by jury, in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, State of Louisiana. On

February 1, 1996, Silva was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.  Silva's conviction was affirmed on direct appeal to the Louisiana Fifth Circuit Court of Appeal but the matter was remanded to the trial court with instructions to formally advise him of the prescriptive period within which to apply for post-conviction relief.  State v. Silva, 685 So.2d 1119 (La. App. 5th Cir. 1996). Writs were denied by the Louisiana Supreme Court on June 13, 1997. State v. Silva, 695 So.2d 964 (La. 1997).  Silva's conviction became final on September 12, 1997 when the ninety day period for him to seek a writ of certiorari from the U.S. Supreme Court expired and no application therefor was made. See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999), cert. denied, 529 U.S. 1099, 120 S.Ct. 1834 (2000).

Thereafter, on June 17, 1998, Silva, through counsel, filed an application for post-conviction relief in the state trial court that was subsequently supplemented and was fully briefed by the parties. Ultimately, on October 7, 2004, the trial court granted petitioner's application for post-conviction relief and set aside his conviction, finding that the State had improperly withheld certain witness statements in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963).  (St. ct. rec., vol. 10 of 12).

2

From that ruling, the State sought writs from the Louisiana Fifth Circuit which, on April 25, 2005, overturned the trial court's grant of relief and reinstated Silva's conviction and sentence. Silva v. Cain, No. 04-KH-1420 (La. App. 5th Cir. April 25, 2005)(unpublished opinion). Writs were denied by the Louisiana Supreme Court on January 13, 2006. State v. Silva, 918 So.2d 465 (La. 2006). Silva filed the instant federal habeas petition on January 17, 2006. (Rec. doc. 1). The respondent concedes that state court remedies have been exhausted as required by 28 U.S.C. §2254(b)(1)(A) and that the petition was timely-filed under 28 U.S.C. §2244(d). (Rec. doc. 5, p. 4).

In the above-captioned application for federal habeas corpus relief, Silva alleges that the State improperly withheld various witness statements in violation of its obligations under Brady, supra. To facilitate a resolution of that claim, the Court will recall the facts of the crime as aptly summarized by the Louisiana Fifth Circuit in the context of Silva's direct criminal appeal, as follows:

> [o]n the night of November 3, 1994, eighteen-year old Bret Kreller and his friend Christian Alfonso went to the New Orleans Lakefront to socialize and drink beer. Afterwards, they proceeded to Sluggo's Bar in Metairie, where they played pool and drank more beer. Kreller's friend Kimberly Berry testified that she was at Sluggo's on the evening of November 3, and had a long conversation with Kreller.

At about 11:30 p.m., Berry and Kreller walked outside the bar so Berry could make a telephone call.  Berry testified that as she walked around the side of the building, defendant Lutgardo "Luke" Silva approached her and asked her if she was "still a f__ing Lakeview chick."  Silva directed other obscenities to her, including "slut" and "bitch".  Kreller and Silva exchanged words over the incident, and Kreller went back inside the bar with Berry.

Berry and Kreller conversed with each other until about 12:45 or 1:00 am. on November 4. Berry testified that she exited the bar with Kreller and a group of his friends.  She told Kreller good-bye, and walked to her car. Berry stated that Kreller appeared slightly intoxicated.  As she got into her car, she saw Silva approach Kreller.  She heard the two speak to each other, but could not hear what they said.

Defense witnesses Jerry Travis Watkins and Shaun Paulin testified that it was Kreller who initiated the confrontation with Silva at Sluggo's.  Watkins stated that Kreller was intoxicated and was acting like a "wild man", attempting to fight with Silva.  He further testified that Silva did not know who Kreller was.  According to Watkins, defendant and Kreller had a verbal altercation outside the bar, and Sluggo's employees told them to leave the premises.  Watkins further testified that Kreller told Silva to follow him so they could continue the fight elsewhere.

Kreller and Alfonso rode in Kreller's pick-up truck to the home of his friend, David Doerer at 8845 25th Street, near the intersection of 25th and Michigan in Kenner. David Doerer lived there with his grandmother. Silva and Watkins followed in Silva's blue Thunderbird.  Some of Silva's other friends, including David Babin and Shaun Paulin, followed.  When the group

arrived at Doerer's house, Kreller and Silva began fighting in a neighbor's driveway. After thirty or forty-five seconds, Kreller was on top of Silva and it was apparent Kreller had the advantage.

Shaun Paulin and Silva's other friends joined in the fight, hitting and kicking Kreller. David Doerer testified that at this point he came out of the house and saw a pile of people on top of Kreller.  One person was kicking Kreller in the head.  Doerer went to Kreller's aid, hitting Silva under the arm with a baseball bat.  Doerer then swung the bat at Silva's friends, chasing them into the street. Silva then pulled a .38 caliber handgun from his waistband and fired.  The bullet hit Kreller in the center of his forehead, and he fell to the ground, dying almost immediately. Silva and his friends fled the area.  Alfonso and Doerer remained at the scene.

Deputy David Short arrived at the scene within a minute after receiving the call over the police radio.  He secured the scene, and called for backup personnel.  Officers reporting to the scene included Lieutenant Don English, Detective Alvin Wickboldt, Detective Phillip Ramon, and Detective Ralph Sacks. Det. Ramon gathered information at the scene including descriptions of Silva and his car, and addresses where he might be located.  At about 4:30 a.m. on November 4, Det. Ramon proceeded to Silva's father's house on Acadia Street in Metairie.  Ramon spotted Silva's car parked in front of the premises, and called for uniformed backup officers.  Deputies Timothy Gandy, Ron Miller, and Michael Brocato responded.

Luke Silva's father answered the door and told the officers that Silva was asleep inside the house.  Silva then walked down the stairs and Det. Ramon ordered him outside.  The officers patted down Silva for weapons and found none.

5

They advised Silva that he was under investigation for murder, and he responded, "I did not want to kill anyone." The uniformed deputies mirandized Silva and transported him to the Detective Bureau.

Det. Ramon obtained Silva's father's consent to search the house. The search uncovered six firearms, all legally registered to Silva's father or grandfather. Four of the guns were seized for testing, but not one of them was the murder weapon.

Luke Silva gave two recorded statements to Det. Sacks at the Detective Bureau on the morning of November 4. Defense counsel offered a stipulation at trial that both statements were made knowingly and voluntarily.

The first statement began at 5:48 a.m. and ended at 5:57 a.m. In that statement, Silva admitted to participation in the fight after leaving Sluggo's that morning, but did not admit to firing a gun. After the first statement was completed, Det. Sacks told Silva he did not believe Silva had told the truth. Silva agreed to give a second statement.

The second statement began at 6:35 a.m. In the second statement, Silva admitted to an altercation at Sluggo's bar with a person he claimed he did not know. Silva further stated that he followed that person to a house, where they fought. Silva stated he had a rusty .38 caliber gun in the waistband of his pants, although he did not intend to use it. He said that the gun fell to the ground during the fight and when a man hit him with a bat, Silva picked up the gun and fired into the air. Silva stated he did not intend to shoot anyone. Silva further stated that he left the scene by himself, and threw his gun out of the car window.

After the statements were completed, Silva was

> formally arrested.  Silva told Detective Sacks that he had discarded the gun in the David Drive Canal at Veterans Boulevard near Chapelle High School.  Officers searched the area for the gun, but were unable to find it.
>
> <u>Silva</u>, 685 So.2d at 1120-21 (footnotes omitted).

As noted earlier, Silva seeks federal habeas corpus relief based upon his contention that the State improperly withheld certain witnesses' statements in violation of <u>Brady</u>.  Before turning to the specific statements in question, the Court will set forth the standards shaping its review of the issues in this matter.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), now codified at 28 U.S.C. §2254(d), prescribes the conditions under which a federal court may grant habeas corpus relief, as follows:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; ...

The above-quoted statute addresses both pure questions of law and mixed questions of law and fact.  <u>Martin v. Cain</u>, 246 F.3d 471, 475 (5th Cir.), <u>cert</u>. <u>denied</u>, 534 U.S. 885, 122 S.Ct. 194 (2001).

7

Under the "contrary to" clause of §2254(d)(1), a federal court may grant habeas corpus relief only if the state court decided a case differently from how the U.S. Supreme Court decided a case on a set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523 (2000).  Under the "unreasonable application" clause of §2254(d)(1), a federal court may grant habeas relief if the state court correctly divined a legal principle from controlling Supreme Court jurisprudence but misapplied that principle to the facts of the case.  Id. Acknowledging the deferential review circumscribed by §2254(d), the Fifth Circuit has held that a federal habeas court is to review only the state court's ultimate decision, not every jot of its reasoning and not even the written opinion explaining its decision. Summers v. Dretke, 431 F.2d 861, 868 (5th Cir. 2005), cert. denied, ___ U.S. ___, ___ S.Ct. ___ (2006)(citations and quotations omitted).  Federal habeas relief is appropriate only where the state court decision in question is both incorrect and objectively unreasonable.  Id. at 869 (quoting Morrow v. Dretke, 367 F.3d 309, 313 (5th Cir.), cert. denied, 543 U.S. 960, 125 S.Ct. 421 (2004)).

In order to establish a due process violation under the precepts of Brady, a petitioner must show that:  1) the state withheld evidence, 2) the evidence is favorable to the defense because it is exculpatory or impeaching, and 3) the evidence is

8

material to guilt or punishment.  Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97.  Materiality is established if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different.  United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383 (1985).  A "reasonable probability" exists when suppression of the evidence "... undermines confidence in the outcome of the trial."  Id. at 678, 105 S.Ct. at 3381.  A Brady violation is established upon a showing "... that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566 (1995)(footnote omitted).  This is so because "... the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."  Id. at 436-37, 115 S.Ct. at 1567.  In determining whether evidence is material for Brady purposes, the Court must consider the cumulative effect of all the suppressed evidence rather than ruling on each item individually.  Id.  "Whether evidence is material under Brady is a mixed question of law and fact."  Graves v. Dretke, 442 F.3d 334, 339 (5th Cir.), cert. denied sub nom, ___ U.S. ___, ___S.Ct. ___ (2006)(citing Summers, 431 F.3d at 878).

     Having set forth the pertinent habeas review provisions and

9

the pronouncements of <u>Brady</u> and its progeny, the Court now turns to the witness statements at issue.  With the exception of the statement of Marshall Monica which will be discussed more fully <u>infra</u>, all of the statements in question were taken within days of the shooting.  Despite timely demand, the statements were not turned over to the defense prior to trial and were only obtained via a public records act request made during state post-conviction proceedings.

The first statement in question was given by Richard Frank, Jr. ("Frank") to Detective Ramon on November 8, 1994 at 4:20 p.m. Frank was a friend of petitioner's, was present at Sluggo's on the evening in question, and had followed two other friends of petitioner, David Babin and Shawn Paulin, from the bar to the location where the fatal altercation took place.  Frank stated that the victim ultimately got the upper hand over Silva and that he (Frank) kicked the victim several times in an attempt to get him off of the petitioner.  A separate fight in the street between Shawn Paulin and another individual prompted Frank to proceed to that area to provide additional support.  While engaged in a one-on-one fight in the street with that other individual, Frank offered the following account of the events:

> Frank:   And I kicked him.  I don't know what was going on.
> We were there.  I just, you know, me and him
> started fighting and when I kicked him I fell down

and I, I got up and I turned around and s-, somebody ran out with the house with a bat and they had somebody behind him and the guy with the bat saying, "I'm gonna kill you.  I'm gonna kill you." And I ran to, I ran and I jumped in my car and I was, I was, put, I put it in drive and I was taking off and I was looking still.  I saw him swinging the bat and I just, I heard a pop and I saw a flash and that was it.

Ramon:   O.K.  Do you know who or where that pop and flash came from?

Frank:   I don't (Inaudible).

Ramon:   You knew, did you know it was a gunshot?

Frank:   I, f-, yeah.

Ramon:   O.K.  Did you see who fired that gun?

Frank:   No, sir.

Ramon:   O.K.  The guy that ran out with the baseball bat, do you know him?

Frank:   No, sir.

Ramon:   You never seen him before?

Frank:   No, sir.

Ramon:   O.K.  Did he hit you with a bat?

Frank:   No, sir.

Ramon:   Did you see him hit anyone with a bat other than swinging at them?

Frank:   I didn't see him (Inaudible)  I didn't see him hit anybody.

Ramon:   O.K.  When the, when the muzzle went off, when you seen the big flash, that was a muzzle flash of the weapon, was that in the same area that Luke and

                        Bret was fighting in?

Frank:    Yes, sir.

Ramon:    O.K.  Was there anyone else standing close to them?

Frank:    Um, I couldn't, um.  I'm not sure.

Ramon:    O.K.  Could you.....

Frank:    I know the guy with the bat was running 'cause he
          ran that way but I'm not sure who was there.

Ramon:    Was, o.k., was Bret and Luke standing or on the
          ground?

Frank:    I'm not sure.

Ramon:    You're not sure.  Did the muzzle flash look like it
          was like if somebody was standing up, did it look
          like it was like face level or if they was kneeling
          down did it look, you know, like it was like waist
          level or something?

Frank:    It was about waist level.

Ramon:    About waist level.  O.K.  But you have no idea, you
          can't tell me that you seen anyone pull a trigger
          or have a gun?

Frank:    No, sir.

Ramon:    O.K.  But it was in the same area that Luke and
          Bret was fighting in?

Frank:    Yes, sir.

Ramon:    O.K.  The guy with the bat, was he standing right
          there when the muzzle went off, when the flash?

Frank:    I knew he was, I saw him run that way but I don't
          know where he was when the gun went off.

Ramon:    So when the gun went off there was only the two of
          them standing right there, Bret and.....

                              12

Frank:      I'm not really sure.  I didn't see 'em.

Ramon:      You're not sure.  O.K.

Frank:      I just knew people ran that way but I don't know
            who (Inaudible) 'cause I was turned around running
            the other way.

Ramon:      O.K.  Uh, do you know if anyone else, other than
            yourself and David and Luke, struck, hit, kicked,
            punched, did anything to Bret?

Frank:      No, sir.

Ramon:      Just the three of ya'll.  Just you, David, and
            Luke?

Frank:      Yes, sir.

Ramon:      O.K.  After this incident, after you heard the
            muzzle flash you got, you was in your car when it
            happened is that correct?

Frank:      Yes, sir.

                              (St. ct. rec., vol. 12 of 12,
                              tab "A", pp. 5-6).

     Petitioner argues that "[t]he above information clearly
supports the defense of justifiable homicide." (Rec. doc. 1, p.
17).  The Court, however, in unable to ascribe to Frank's statement
the meaning and importance suggested by petitioner.  Initially, the
Court notes that Frank was not called as a witness at petitioner's
trial by either the State or the defense.  In fact, the defense
made the deliberate decision not to call Frank as a witness because
his testimony would have been cumulative.  (Tr. pp. 1144-1145). As
reflected by his statement, Frank was a high school friend of the

petitioner's.  As such, he was presumably available to the defense prior to trial to reveal the fact that he had been interviewed by the police and the contents and substance of the statement that he gave.  <u>See</u> <u>Rector v. Johnson</u>, 120 F.3d 551, 558-59 (5th Cir. 1997), <u>cert</u>. <u>denied</u>, 522 U.S. 1120, 118 S.Ct. 1061 (1998)(State has no obligation to point defense toward potentially exculpatory evidence that can be discovered through the exercise of due diligence).  At trial, numerous witnesses, including David Doerer, Christian Alfonso, Jerry Travis Watkins, Shawn Paulin, David Babin, and petitioner himself testified that Doerer had come to the victim's aid armed with a bat at a time when the victim was outnumbered and was being overpowered by petitioner and a group of his friends. Shawn Paulin testified for the defense that Doerer was screaming something when he emerged from his house with the bat and Doerer himself admitted that he had yelled words of a confrontational nature as he was running to the aid of the victim.  (Tr. pp. 1120, 972, 988-989).

Frank indicated in his statement that he did not know from whom or where the flash of the gun came; that he did not see who fired the gun; that he did not see Doerer hit anyone with a bat; that the muzzle flash was in the same area where petitioner and the victim were fighting but that he was unsure whether anyone else was standing close to them; that he was unsure whether petitioner and

the victim were standing or were on the ground; and, that he did not know where Doerer was when petitioner fired the gun. Indeed when asked whether, at the moment the shot was fired, it was only petitioner and the victim standing there, Frank answered that "I'm not really sure ... I didn't see 'em." (St. ct. rec. vol. 12 of 12, tab "A", p. 6). The Court is unable to say that Frank's vague statement, had it been disclosed to the defense, creates a reasonable probability that the result of Silva's trial would have been different.

Moreover, although the majority of the witnesses who were called to the stand were friends of either petitioner or the victim and testified to animosity between the two of them and their respective camps over a period of time, perhaps the most damaging testimony against Silva came from three neutral, independent parties who owed allegiance to neither side. The first of those witnesses was Dr. Susan Garcia, the coroner who performed the autopsy on the victim. Garcia testified that the track of the bullet, which had no deviation, was "right to left, down and back," a course that was inconsistent with a shot being fired up in the air as petitioner claimed. (Tr. pp. 850-851). When asked to opine on the relative elevations of the murder weapon and the victim, Garcia testified that "[t]he decedent's head was in a position such that it was beneath of the muzzle of the gun..." (Tr. p. 851). In

15

addition, Dr. Garcia testified that based on the presence of stippling[1] around the entrance wound, the distance between the muzzle of the gun and the victim's face was twelve to eighteen inches and that it was physically impossible to have the presence of stippling if the shot were fired randomly.  (Tr. pp. 852-854). Without wavering, Dr. Garcia further testified that the wound in question was consistent with the shooter being slightly taller than the victim and firing from twelve to eighteen inches away and that it was simply inconsistent with the shooter being on his knees and firing up into the air as Silva claimed.  (Tr. p. 855).  On cross-examination by the defense, Garcia testified that, if the shooter had been positioned below the victim, the path of the bullet would have been back and up, not back and down as she had discovered during the course of the autopsy.  (Tr. p. 856).

The other two unbiased, independent witnesses to the shooting were Willard and Eudora Trosclair, a couple who resided in a house that was located nearby.[2]  Willard testified to being awakened by

---

[1] Stippling refers to the small particles of lead that are shaved off of the interior of the muzzle when a gun is fired.  (Tr. pp. 852-853).

[2] The Trosclairs were two of the last three witnesses the State called in rebuttal, the final one being Shane Morel who testified that on the one-year anniversary following the shooting, he observed petitioner and some of his friends toasting to the occasion at a local bar.  (Tr. pp. 1333-1342).  Being the final witnesses that the jury would hear from, the testimony of these

a car horn and loud talking and, upon looking out of his window, to seeing a group of people fighting approximately thirty feet away. By the time he asked his wife a second time to call "911", Willard looked out again to see the group formed in a circle.  He then saw the muzzle flash from the gun, with the shooter and the victim facing each other from a close distance and with both of them standing up.  Willard further testified that the shooter was slightly taller than the victim and that the muzzle flash was between chest and neck height.  The victim then fell over backwards and the remainder of the individuals outside scattered.  (Tr. pp. 1299-1310).

For her part, Mrs. Trosclair also testified to being awakened and seeing a number of individuals fighting outside, some of whom were in the street.  One of the participants was down on the ground with a group around him, kicking and hitting him.  Mrs. Trosclair called the police and, upon returning to the window, observed a group of individuals underneath a tree, standing and facing each other.  She testified that "...within seconds, I saw a gun fired" with the shooter and the victim being two to three feet apart.  The victim then fell backwards with his hands up.  Notably, Mrs. Trosclair testified that the shot was not aimed backwards, that she

---

three witnesses undoubtedly carried significant weight.

did not see anyone behind the shooter, that the shooter was the tallest individual there, and that the muzzle flash was approximately chest height. (Tr. pp. 1311-1319).

Contrary to petitioner's present assertions, Frank's pre-trial statement did not provide support for a justifiable homicide defense. And in light of the compelling testimony of Dr. Garcia and the Trosclairs, confidence in the jury's verdict is not undermined by the non-production of the statement in question.

The second witness statement at issue is the first of two statements given by Christian Alfonso to police several hours after the murder. (St. ct. rec., vol. 12 of 12, tab "B-1"). Relying on the state trial court's grant of post-conviction relief, Silva contends that the statement was inconsistent with Alfonso's trial testimony and that he was deprived of the opportunity to impeach the witness. Petitioner argues that "[a]t trial, Mr. Alfonso testified for the state that he had been a participant in the fight between Brett and Mr. Silva, and that he had struck Mr. Silva. He further testified that several seconds after he struck Mr. Silva, Mr. Silva shot the victim." (Rec. doc. 1, p. 18). A careful review of the trial transcript, however, reveals no testimony from Alfonso that he had struck petitioner at any time.

Petitioner argues that Alfonso's statement to police was so at odds with his subsequent trial testimony so as to constitute

18

significant impeachment evidence and result in a <u>Brady</u> violation.
For example, Silva contends that prior to trial, Alfonso "... told
police that he did not actually know Mr. Silva, but had merely
heard his name before." (Rec. doc. 1, p. 18). A review of the
statement in question does not bear this out. The relevant portion
of Alfonso's transcribed statement is as follows:

Ques: Okay. And, while you were at Slugo's, did anything
unusual occur there?

Ans: Yeah, um, Brett got in a - Brett and Luke got in a
little shove and push match. And then they wanted
to go take it further, so we left.

Ques: Okay. Who's Luke?

Ans: Um, the guy that Brett had fought with later on in
the night.

Ques: Do you know Brett's last - I mean, correction, do
you know Luke's last name?

Ans: Silva.

Ques: Okay. How long have you know Luke Silva?

Ans: Uh, I can't really say that, I just - I've heard of
him. I've heard of him over the last past year or
two.

Ques: <u>Well</u>, <u>but</u> <u>I</u> <u>mean</u>, <u>you've</u> <u>seen</u> <u>him</u> <u>on</u> <u>other</u>
<u>occasions</u> <u>besides</u> <u>tonight</u>, <u>is</u> <u>that</u> <u>correct</u>?

Ans: <u>Basically</u>, <u>yes</u>.

Ques: Okay. So if you saw a picture of him you'd be able
to identify him?

Ans: Yes sir.

                                    (St. ct. rec., vol. 12 of 12,
                                    tab "B-1", p. 2)(emphasis added).

     A fair reading of Alfonso's pre-trial statement reveals that,
although he and petitioner may not have been formally introduced
prior to the incident, he had indeed seen Silva on other previous
occasions and was familiar with who he was.  The most significant
of the discrepancies cited by petitioner centers on the distance
between himself and the victim when the shot was fired.   In his
pre-trial statement, Alfonso responded to the police's inquiries as
follows:

         Ques:    Alright.  Um, so, what happened when the gunshot
                  occurred?

         Ans:     All of a sudden I just saw it.  And I saw Brett go
                  back.  I saw somebody run.  And I heard David tell
                  me to get down.  And I jumped behind the car that
                  they had started fighting on.

         Ques:    Okay.

         Ans:     And he had jumped behind his car.

         Ques:    Who - when the gunshot went off, who was the person
                  that Brett was fighting with?

         Ans:     Luke Silva.

         Ques:    Okay.  Luke was the only person around Brett when
                  the shot went off?

         Ans:     Yes.

         Ques:    Everybody else was off away from him?

         Ans:     Scattered, yes.

                                   20

Ques:      Okay.   So, do you feel that Luke was the person
           that - that shot Brett?

Ans:       Yes (Positive Response).

Ques:      Okay.  Did you see a muzzle flash go off by - by
           them?

Ans:       Yeah.  I saw the light.

Ques:      Okay.  How far was - would you say was Luke away
           from - from Brett when the gunshot went off?

Ans:       Three to five yards.

Ques:      So they were - I mean in close proximity?

Ans:       Yeah (Positive Response).

Ques:      Was Brett facing Luke at that -

Ans:       Yes.

Ques:      Okay.  Did - did he try to run, or did he know that
           - that he was gonna get shot?

Ans:       He didn't - it was too quick.  He didn't know.

Ques:      Okay.  Did you see Luke pull the gun out?

Ans:       No I didn't.

Ques:      But you could see the muzzle flash coming from
           where he was at?

Ans:       Yes.

Ques:      So it came from like Luke's person or?

Ans:       Yes.

                        (St. ct. rec., vol. 12 of 12,
                         tab "B-1", pp. 7-8).

At trial, Alfonso testified that when the shot was fired, the

21

gun was roughly at a level of between head and shoulder height and that the victim was facing petitioner at a distance of "[a]bout two feet" apart. (Tr. p. 1015). In light of the actual verbiage used by Alfonso in both his statement and his trial testimony, it is obvious that he was merely giving estimates of the distance between petitioner and the victim, which estimates possibly differed by as little as one foot. Alfonso's statement and trial testimony, when considered together, were actually consistent with Mrs. Trosclair's testimony that petitioner and the victim "... looked close, you know, maybe two or three fee apart. Not that far." (Tr. p. 1314). Considering the weighty testimony of Dr. Garcia and the Trosclairs, the discrepancies complained of by petitioner are not sufficiently material so as to constitute a <u>Brady</u> violation.

The third witness statement at issue was given to police by David Doerer on November 4, 1994 at 4:25 a.m., just hours after the shooting. Just like the first two statements discussed above, petitioner contends that Doerer's pre-trial statement, when compared with his trial testimony, was so fraught with inconsistencies so as to constitute material impeachment evidence that was improperly withheld in violation of <u>Brady</u>. Here, again, the Court disagrees.

Accordingly to petitioner, "Mr. Doerer testified that he did not scream any threats as he was running toward Mr. Silva."

22

(Rec.doc. 1, p. 19).   Silva, however, is incorrect.   On cross-examination, Doerer testified that, prior to striking petitioner with the bat, he yelled "[y]ou all want to jump somebody?" (Tr. p. 988).  This is consistent with Doerer's pre-trial statement that as he was proceeding to the location where the victim was being beaten and prior to the time that he struck petitioner with the bat, he "... was screaming like - I was making noises." (St. ct. rec., vol. 12 of 12, tab "C-1", p. 4). Silva also cites as "highly prejudicial" Doerer's testimony that petitioner "... intentionally fired the gun at the victim at a time when the fight was concluding." (Rec. doc. 1, p. 20).  At trial, Doerer offered the following testimony regarding the latter stages of the physical altercation between petitioner and the victim and just before the shot was fired:

> Q.   All right.  Now stop there for a second.  You said Bret swung Luke around.  Did they break free of each other at that point?
>
> A.   Yeah, they were bout to let loose of each other.

> (Tr. p. 974).

In his pre-trial statement to police, Doerer offered the following account of that aspect of the altercation:

> [b]ut the one guy Brett was having they got up, they stood up. Brett pushed 'em off, like let him go.  Just kind of pushed him away.  The guy took a step back and just pulled the gun out and shot him.

(St. ct. rec., vol. 12 of 12, tab
"C-1", p. 2).

Thus, in both his pre-trial statement and his trial
testimony, Doerer indicated that petitioner and the victim were
concluding their physical confrontation and were in the process of
separating when the fatal shot was fired.  And although he advised
authorities prior to trial that petitioner "... pulled the gun out
and shot [the victim]," he specifically stated that "... I didn't
see the weapon.  I didn't see him pull – I didn't see the weapon
itself.  I just seen his arm go up, and I like – I turned my head,
and I heard the shot."  (St. ct. rec., vol. 12 of 12, tab "C-1",
pp. 2, 3).  That was largely consistent with his trial testimony to
the effect that he was not looking at petitioner's hand and thus
did not actually see a weapon at any time.  (Tr. pp. 974, 989).

Finally, petitioner cites as having significant impeachment
value Doerer's pre-trial statement that he had never seen Silva
before the night of the shooting.  According to petitioner, in
light of the long-time friendship between Doerer and the victim,
the fact that Doerer had not seen petitioner prior to the shooting
undercuts the State's theory that there was a long-standing feud
between Silva and the victim which was used to prove that
petitioner harbored the requisite specific intent to kill.  (Rec.
doc. 1, p. 20).

24

Having reviewed the trial transcript in its entirety, at no time was Doerer asked whether or not he had met or seen petitioner prior to the events of November 4, 1994. Accordingly, there was nothing along those lines which can be said to be inconsistent with Doerer's pre-trial statement so as to rise to the level of material impeachment evidence under <u>Brady</u>. Moreover, simply because Doerer may not have seen Silva prior to trial does not, in and of itself, demonstrate that animosity did or did not exist between petitioner and the victim. Most importantly, given the strong circumstantial evidence testimony of Dr. Garcia and the eyewitness testimony of the Trosclairs, Silva's actions in aiming his gun directly at the victim constitute sufficient proof of intent to kill or to inflict great bodily harm. <u>Silva</u>, 685 So.2d at 1125.

Marshall Monica gave the fourth disputed statement to authorities on September 9, 1995, nearly ten months after the murder. In it, he recalled an incident that had occurred during a party at the house of a friend, Mark Verhoeren, some time before the murder in question. In his statement, when asked whether he saw petitioner with a gun "... at the party," Monica answered in the negative but added that Silva himself had told Monica and his friends, including the victim, that he was armed and that he was going to shoot all of them. (St. ct. rec., vol. 12 of 12, tab "D", pp. 5-6). At trial, Monica testified that when petitioner first

25

pulled up at the Verhoeren residence, Monica saw a gun between the two seats in Silva's car.  (Tr. p. 812).  Those two accounts are not necessarily inconsistent as Monica was not specifically asked prior to trial what he may or may not have seen in Silva's car.  As for the incident at Friar Tuck's Bar, prior to trial Monica described that incident as follows:

Ques:   Okay.  Tell me a little bit about that incident.

Ans:    Uh, Bret and I were upstairs shooting pool, when Luke confronted us.  He started telling us lets (sic) go outside, I'm gonna get you, I'm gonna put a cap in  your ass.

Ques:   Okay.  At that night did you see him with a gun?

Ans:    No.

Ques:   Have you ever seen him with a gun up to this point?

Ans:    Yes.

Ques:   You have seen him with a gun before?

Ans:    (Can hear no response.)

Ques:   That - did you see him with a gun that night at Friar Tucks?

Ans:    No.

Ques:   Okay.  But he made a reference, he reached in his waistband?

Ans:    Right.

Ques:   He told you he had a gun?

Ans:    Right.

26

                                    (St. ct. rec., vol. 12 of 12,
                                    tab "D", p. 3).

     At trial, Monica offered the following similar account of the

incident at Friar Tucks:

     Q:   Tell these people what happened.

     A:   We went to Friar Tuck's, which is a bar on Carrollton in
          New Orleans, and this bar has an upstairs and a
          downstairs.  And several of our friends went out that
          night and then Bret and I decided to go upstairs to play
          pool, because there's only one pool table downstairs and
          a few upstairs.

          When we got upstairs, Bret and I were alone, separate
          from our friends, and Luke and several of his friends
          were standing together, and after we were there for about
          five or ten minutes upstairs, he walked up to Bret and I
          and he started, "Let's go outside right now and end
          this."  He had his hand hiding, like tucked away, trying
          to indicate to us that he had a gun.

          He was like, "I'll go outside right now and shoot both of
          you, especially you," you know, pointing at both of us.

                                    (Tr. pp. 817-818).

     Thus,  both prior to and at trial Monica stated that he never

saw petitioner with a gun at Friar Tuck's but that Silva implied

and acted as if he had one.  And Silva's threats to shoot not only

the victim but those who were with him as well were consistent in

Monica's pre-trial statement and trial testimony.  Moreover, the

incidents described by Monica were remote in time from the events

that took place on the night of the murder.  The impeachment value,

if any, of Monica's pre-trial statement falls far short of being

material impeachment evidence under <u>Brady</u>.

Finally, the fifth pre-trial statement at issue was given to authorities by David Babin on November 7, 1997 at 6:00 p.m. Before turning to the inconsistencies alleged to exist between Babin's pre-trial statement and trial testimony, the Court notes that Babin was the eleventh witness to testify for the defense at petitioner's trial. As such, petitioner knew, or could have discussed by the exercise of due diligence, both that Babin had spoken with authorities prior to trial and the content of the statements that he gave. <u>Rector</u>, 120 F.3d at 558-59. The Court further notes that in its written decision overturning the trial court's granting of post-conviction relief to petitioner, the Louisiana Fifth Circuit Court of Appeal observed that "Silva presented no evidence at the post-conviction hearing to show that, although <u>he interviewed Babin before trial</u>, he did not have information from him regarding these statements." <u>Silva</u>, No. 04-KH-1420, unpublished op. at p. 4 (emphasis added). It therefore appears that the defense did, in fact, interview Babin before trial and that it should have known of the substance of the statement that Babin gave to police. Furthermore, by the time that Silva's trial went forward, Babin had already pled guilty to armed robbery and attempted murder and was serving a five-year sentence for those crimes. (Tr. pp. 1129-1130). Babin's credibility in the eyes of the jury was thus

28

significantly diminished from the outset of his testimony.

Petitioner first contends that Babin's pre-trial statement contained critical exculpatory information to the effect that the victim had instigated the fight by telling petitioner to follow him from Sluggo's to another location for that purpose and by the victim throwing the first punch. This is precisely what Babin testified to at trial with the added detail that the victim threw the first punch but missed. (Tr. pp. 1119-1120). Silva himself testified similarly that the victim had asked petitioner to proceed to a location for the purpose of fighting and that the victim had thrown the first punch, albeit an unsuccessful one. (Tr. pp. 1159-1160).

Measured against the foregoing testimony was the second of the two statements petitioner had given to police just hours after the murder. In that statement, Silva makes no mention of the victim inviting him to proceed to a different location for the purpose of fighting. (St. ct. rec., vol. 12 of 12, tab "F-2"). To the contrary, Silva advised police that after the victim had left Sluggo's, petitioner and his group drove to Veterans Boulevard and, upon seeing the victim, decided to follow him. (Id. at pp. 2-3). Moreover, at trial Silva admitted to being armed with a concealed, fully-loaded .38 pistol that night, first while at Sluggo's and then at the murder site. According to Silva, he only remembered

that he was armed while en route to Doerer's residence when Harry
Travis Watkins, who was a passenger in petitioner's car, advised
Silva who the victim was and his reputation.  (Tr. pp. 1174-1192).
Silva was unable to say why he was armed that night or what he had
paid for the firearm but admitted to choosing to remain armed prior
to arriving at Doerer's house because he was by that time aware of
the victim's reputation.  (Id.).  He also admitted that he had lied
in his first pre-trial statement to police regarding the existence
of and his firing of the weapon and that he did, indeed, want to
fight the victim.  (Id.).  Silva also gave conflicting testimony as
to whether he had experience shooting firearms prior to the murder
and he also admitted to being affiliated with a gang as a young
teenager.  (Id.).

Petitioner additionally contends that Babin's pre-trial
statement would have provided facts directly supporting the
defense's theory of justifiable homicide based on Babin's report
that Doerer screamed threatening words as he emerged from his house
armed with a bat.  As discussed earlier, numerous witnesses for the
prosecution and the defense testified to Doerer's actions and
statements.  And what Silva overlooks is the fact that Doerer's
actions and words were in response to his seeing the victim on the
ground being kicked and beaten by petitioner and three or four of
his friends.  Babin's statement provides little justification for

petitioner shooting the victim rather than the bat-wielding Doerer instead.  And whether or not the victim threw the first punch does not make reasonable petitioner's wholly excessive response of shooting an unarmed man in the head.  The matters set forth in Babin's pre-trial statement were either cumulative of other witnesses' testimony or were so inconsequential so as to fall short of constituting material evidence within the meaning of <u>Brady</u>.

The Court has painstakingly reviewed the transcript of petitioner's trial, over eight hundred pages in length, to place the five withheld statements in their proper context in relation to the testimony of all of the witnesses who testified at Silva's trial.  Having done so, what is conveyed to the Court is that the petitioner, who was admittedly armed with a concealed weapon, voluntarily chose to follow the victim to a location for the express purpose of fighting.  When Silva began losing the fistic encounter, even after his friends had come to his assistance, he drew his weapon and shot the victim between the eyes at point blank range.  The testimony of Dr. Garcia and the Trosclairs provides independent, unbiased support for this conclusion.  The state courts' decisions, that the withheld statements were not sufficiently material so as to constitute improperly withheld evidence under <u>Brady</u>, were not both incorrect and objectively unreasonable and, as such, are entitled to deference here under

§2254(d)(1).

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that the application for federal habeas corpus relief of Lutgardo Silva be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judges report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United States Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this  19th  day of  September  , 2008.


ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

32